Judges, it's 10-51, so just let me know when you're ready. We're ready. Admitting him now. The Honorable Judges of the United States Court of Appeals for the Tenth Circuit. Welcome back. Our fourth case this morning is 20-1310, Obeslo v. Great-Western Life. Mr. Wolf, you're for the appellant. Yes, Your Honor. Thank you, Your Honor. May it please the Court. If I may, I would like to reserve three minutes of my argument for rebuttal. The district court was supposed to determine whether the fees defendants charged on the mutual funds at issue in this appeal were within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances. The district court, however, ignored the circumstances that were specific to these funds. Instead, the court determined that because the fees of these funds were within the range of other mutual funds in the market generally, they were appropriate and defendants were not liable. The court based that decision on its belief that market competition constrains pricing based upon the theory of Dr. Glenn Hubbard, and therefore, what the market rates are for similar funds must be what would have been negotiated for the funds in this case. The Supreme Court in Jones v. Harris Associates, however, rejected just such a heavy reliance on the fees of other funds, noting that those fees, quote, may not be the product of negotiations conducted at arm's length, end quote. In fact, the Second Circuit in Gartenburg, which the Jones court affirmed as the proper standard states, quote, if rates charged by the many other advisors were an affirmative competitive criterion, there would be little purpose in section 36B. That is exactly what Dr. Glenn Hubbard's theory was in the Seventh Circuit decision in Jones v. Harris. That's the theory of Dr. Hubbard and the only two publications he's ever published regarding mutual fund fees. What would you say the breakdown in the board's process was here? The breakdown of the board's process was that the board also didn't consider the factors specific to these funds, including the growth in assets over time, the growth in profit margins over time, the fact that the sub-advisors who were doing the actual investing of the fees, but capital management was not doing that, and disregarding the fact that capital management's own calculation of what its top competitors in the Empower retirement system were charging was the fee that it used for eight of its mutual funds, but not for the at-issue funds in this appeal, which were as large as or even larger than those eight funds. When they were confronted with that fact at trial, what the directors did was fell back on competitive fees. They said, in fact, that third-party advisors, Lipper specifically, came in and told them that the fees are reasonable because they're within range. That's the kind of heavy reliance on fee comparisons that the Supreme Court explicitly rejected. Well, the Supreme Court didn't explicitly reject it. It said that you need to give it the weight to which it's entitled, that you can't rely on it to the exclusion of all of the other factors, and it looks to me like the court here went through all of those other factors. Well, it's not out as a factor, but it cannot be as heavily relied on as both the directors and the district court did in this case. And the whole concept that market competition constrains pricing and therefore sets reasonable fees, what could have been negotiated at arm's length, was the entire basis of the Seventh Circuit's decision in Jones. And that decision was vacated, and the Supreme Court in Jones specifically stated, that's a matter for Congress, not the courts. Section 36B is still on the books. The district court did not address the fact that for these funds, the profit margins are increasing even as assets are increasing, which is not proper because even Gartenberg points out, mutual fund advisors are supposed to be reducing their fees as assets increase, so that the profit margins aren't increasing at the same times as assets are increasing, exponentially boosting their profits. Well, I think that the district court, as I understand his opinion, found your expert not credible on this, in part because the expert didn't consider ways in which there were other methodologies by which the increase in profits were taken account of in terms of fees. Right. And as we point out in our brief, that was factually unfounded, because if the advisor were sharing economies of scale, the profit margins wouldn't be increasing as assets increase, right? The expenses for these funds are expressed as a percentage of assets. So if they're sharing the gains that they're earning from economies of scale or any other source, then the expenses as a share of assets should be either level or possibly going up. But in this case, the operating expenses as a percentage of assets are going down as assets increase, and that's boosting the profit margin to the advisor. Increased profits isn't the issue, right? I mean, the standard that's been set by the Supreme Court, which is probably why these cases are generally not successful, is that you've got to show that this particular level of profits is completely outside bounds of what people at arm's length would have negotiated. And I think one of the problems that the district court had is there really wasn't any evidence of what those bounds were. Well, but Your Honor, that is incorrect. It is not a test of what is the proper profit margin. There's no red line for what's an appropriate profit margin or what's not an appropriate profit margin, although the directors were advised by their outside counsel that that level is 77%. But it's a fact that has to be considered. So Your Honor, if you're negotiating at arm's length, you see that the advisor's fee, which has been in place since 2010 when assets were under a billion dollars, is the same fee when assets are over $2 billion. The profit margins are going up as the assets are going up. So the profits are increasing exponentially. And the advisor's own calculation of what its competitors' fees are for these retirement plan mutual funds is only 12 basis points. And the advisor would be profitable at 12 basis points. And the advisor's using that same metric to set its fees on eight other mutual funds that are either the same size or smaller. They're all far smaller than the S&P 500 index. You challenge on profitability, you challenge the total expense ratio measurement. What's wrong with using that as an appropriate tool? What's wrong with it is that it takes into account compensation to individuals other than the advisor. So under the Investment Company Act, the investment advisor owes a fiduciary duty as to its compensation or the compensation of its affiliates. And a shareholder's entitled to sue for breach of fiduciary duty, the advisor and or the affiliates. And we did that in this case with capital management and life and annuity. Total expense ratio includes a lot of other items that are expenses for the mutual fund other than the advisor's compensation. So in a way of speaking, it's not comparing apples to oranges. And then the fee comparisons that they have, that bears out. So at one point before the life and annuity administrative services fee was split out, that was all lumped in together with capital management's fee. And then that total for the S&P 500 index fund, 60 basis points, combining 25 for the including the other mutual funds, 12B1 fees and other fees that have nothing to do with capital management's compensation or life and annuities compensation. And looking at that 60 figure doesn't tell you whether the 25 basis points that's going to the advisor or its services is compensation that is disproportionate to the services that that advisor provided. If you look at total expense ratio, you can't tell if the compensation to the advisor is disproportionate to the services that the advisor provided because you're looking at services that a lot of other individuals are providing at the same time. So you're mixing in a lot of extraneous information. Well, I mean, I get that as a logical matter, but as a metric to try to determine whether the fees are beyond the bounds, why is there any authority that says the total expense ratio would not be one factor that you could consider? No, there's no authority that says that. There's very little authority in this area at the appellate level and higher. One thing that's noteworthy is that the Supreme Court in Jones nowhere mentions total expense ratios as the appropriate metric. But going back, I'm sorry, go ahead. Well, just your honor, all I would point out is that there are only six cases cited that defendants claim approved the use of total expense ratios, but only two of those cases actually discuss whether it's appropriate to use those total expense ratios. And only one of them, the chill case, really talks about that's Dr. Hubbard's theory for how to do this and doesn't really explain how that comports with the language of the statute. Going back to Judge McHugh's point earlier, though, I mean, you look at Jones and the language that it uses is that it has to be so disproportionately large that it bears no reasonable relationship to services rendered. Now, given the burden is on you to establish that that is, in fact, the case, that's a very expansive view of what would be appropriate fees. And so what is it what is what is the the key element? I mean, I know there are a bunch of factors that you would look at, but what key among the things here, what is most salient to you that that indicates to you that the advisors here meet that standard of liability? The S&P 500 index fund, as an example, those fees were set well before 2010 when the fund was less than a billion dollars. By 2014, that fund was over two billion dollars and the fees remained the same. That's contrary to the principle expressed in Gartenberg that advisors are supposed to cut their fees as assets increase. And it was immensely profitable to capital management because even if it kept its profit margin at the same level, its profits would be going up in dollar terms as the assets increased. But because its expenses are dropping as assets increase, its profit margin is increasing at the same time, both in percentages and in dollar amounts. And under those factors, a fee that may have been reasonable back in 2010 at under a billion dollars can't be reasonable again in 2016 or 2015 or even 2014 when it's over two billion dollars. That's predicated on economies of scale. Is that what you're getting at? It's predicated on growing profit margin. We can say that it's economies of scale or we can get into a debate over what exactly constitutes an economy of scale. But it's recognized by the SEC and Gartenberg essentially in saying that you drop your fees as assets increase. Yes, that's economies of scale. What's the magic number here? How do we draw that line? There's no magic number, but it has to be considered and explained. The district court here did not even address the issue of the fact that the profit margins are going up. And this fee has been in place since 2010. And this fee is above the 10 basis point fee that the president of Great West himself says is what index funds charge. These are all but one of them are index funds. Great West's own president, Robert Reynolds, who used to run Putnam Funds, a mutual fund company, said index funds charge 10 basis points. I mean, that's even higher than the average of capital management's competitors among Empower Retirement Plans, which was 12 basis points. And even in the fee- I think the problem in the record here is that you can point it and say it's greater than it was and that the profit margin has increased. But I don't see anywhere that you went beyond that and said, and that meets the Jones standard of being so disproportionately large that it bears no reasonable relationship to the services rendered. Well, we do, because the fact that the profit margins are going up at the same time that assets are increasing shows that economies of scale aren't being shared. Here's another example for the S&P 500 index fund. Capital management hires its own affiliate as of 2016 to manage that fund. Capital management's not managing any of these funds, and reduced its sub-advisor's fees. Right? So it cut its expenses deliberately there. It didn't immediately share that with shareholders. It kept the profit itself. In the Templeton Global Bond Fund, the advisor, Franklin Advisors, had a fee schedule that reduced its fees as the fund hit $100 million and $200 million in assets. But capital management didn't do that. Do we have to find the district court committed clear error here? As to its factual findings, the standard is clear error. But as to misapplication of law, it's a de novo issue. Are you alleging any clear errors of all the legal application to Jones and Gartenberg? It's predominantly the legal application of Jones and Gartenberg. But we point out a number of instances of clear errors and facts, including the basis for the court's finding that our expert was not credible. Which, again, was in the court's section on damages, not on the facts of the case. And on the question of damages, the court's legal error there is saying that you only get the outer bounds of what the market rate is, not a calculation of what a reasonable fee would have been under the circumstances. All right, counsel. Thank you. Your time has expired. Let's hear from Mr. Murphy. Your Honor, Sean Murphy for the defendants. May it please the court. Plaintiffs are attempting to undo the result of an 11-day trial. And to do that, they'll need to demonstrate that Judge Arguello was made reversible errors to her judgments on liability and damages. And plaintiffs cannot prevail on this appeal unless they overturn both judgments. I'd like to address four main points today. One is the standard under Section 36B. Second, how Judge Arguello's decision is consistent with that standard and also consistent with the voluminous record at trial. Third, I'd like to address more globally some of the problems that plaintiffs face on this appeal. And by that, I just mean given the nature of the judge's decision, many of plaintiff's arguments on appeal would not change the outcome. I mean, plaintiffs challenged dozens of factual findings under the Gartenberg factors. But this court would have to find clear error on many of them before you'd look at them collectively and say the result would be different. And fourth, I'd like to just briefly cover damages, which, as I said, is an independent grounds for affirmance. And I also think it's a very simple and straightforward issue in terms of a ground to affirm the trial court's decision. Starting with the standard, obviously, Jones v. Harris set the so disproportionate standard that we've been talking about. But I just want to make clear the statute uses the term fiduciary duty. Obviously, in this context of the statute and the investment company more broadly, the Supreme Court and Congress made clear that it's quite different from some of the fiduciary standards you'd see under ERISA or common law. Congress rejected reasonableness as the standard, expressly rejected, as Jones notes, and rejected rate regulation, noted that courts should not sit as rate regulators. And lastly, I'd say about the standard is the important role that the independent board of directors plays in approving the fees each year. Obviously, if they have a robust process, the court should give that decision to approve the fees substantial deference. Plaintiffs have a heavy burden. I don't think there's much dispute about that. And as Judge McHugh noted, no plaintiff in 50 years since the statute is enacted, no has been successful in proving a violation of 36B. Well, there's always a first time. And so let's talk about the counsel's points as one salient indicator that the Jones standard is met, the S&P 500, and the fact that the assets grew dramatically, and so did the profit margins. Why isn't that an indicator of a problem in terms of disproportionately high fees? So, Your Honor, what I'd say is there's two parts to that. One is profitability, which is a Gartenberg factor, and one is economies of scale. I don't think the profit margin is, meets a level where plaintiffs would meet their burden of proof. Whether you look at defendant's profit margins or plaintiff's profit margins, I think defendants, the highest profit margin of any fund was 70%, and the plaintiff's experts said the highest profit margin was 56%. So the profitability of the fund does not support a violation of 36B under that factor. In terms of economies of scale, the plaintiffs are simply saying the profitability grew. The court was presented with evidence, which is cited in her proposed findings that she including the S&P 500, and showed that profit margins were relatively stable over a five-year period from, you know, 2012 to 2017. Plaintiff's profit margins are the ones that they're suggesting the court should look at that the court rejected. They're looking at the profitability of individual share classes, which I think the court used S&P 500 as an example and said that accounted for like 30% of the assets. It's not the profitability of the fund, it's the profitability of some subset of it. But the other thing I would note is profit margins have been widely held not to be dispositive of economies of scale, as plaintiffs are suggesting. Profits can go up and down for reasons other than scale, and they're ignoring, the plaintiffs fees, lowering fees, such as reinvestments and services. And there was a lot of testimony, again, cited by the trial court, showing that the advisor was sharing economies of scale in other ways, making investments that benefited shareholders. And so you can't look at economies of scale and profitability, even and say, therefore, economies of scale are not being shared. But if I drop all of that, your honor, I'm back to my point about, you know, if they had a showing under economies of scale, which I think they failed, you're left with one factor. And there are five other factors, including most importantly, the board. The other thing I'd note about the S&P 500 fund is those fees were cut during the relevant time period. There were waivers on that fund where fees were reduced during the relevant time period. Plaintiffs, you know, they sued on three years, 2015, 2016 and 2017, and the fees were reduced in 2016. So I think there was a lower fee towards the end of the relevant time period. And by board, as being an important factor, you're focused on the rigorousness of the process by which they determine what was an appropriate fee for the advisors. Is that what you mean? Yeah, I mean, I think that would be one of the most important things I would note, your honor, is I think that's the most important factor. As Joan says, 36B has two elements, procedure and substance. And if you look at what the judge found, she spent a lot of time assessing the board and had findings on the board across a range of factors, some of which the plaintiffs don't challenge. You know, they do not challenge, for example, that the board was independent. They do not challenge that the board was qualified. And there are a number of findings as to their diligence and other aspects of their process that the plaintiffs don't challenge. And I think if I look at the board, I would say that's one of the significant hurdles that the plaintiffs face on this appeal in the sense that they are saying or acknowledging the board was procedurally robust, but not substantively robust. Those are their words that appear in their briefs. And if you look at Jones v. Harris, they say 36B has two elements, process and substance. The process is the board. Did they have a good process? The substance is the fee. And what plaintiffs are doing is they're conflating the two and saying, well, I don't like the result. The fees are still the same. They should have gotten fee reductions earlier. I think one of the points that they make is that when you look at the testimony of the, I think it's the 15C process, that the board never considered the Gartenberg factors. And I think the plaintiffs point to that as being how it was substantively deficient. That's absolutely incorrect, Your Honor. The plaintiffs are absolutely incorrect. The judge's findings clearly say that the judge considered each of the Gartenberg factors and a fund governance expert testified that they received information on each of the Gartenberg factors and that they were sufficient for them to form an opinion as to the fees. And the board repeatedly testified throughout trial. Again, plaintiffs were trying to lock them into saying which factor was the most important. And they said, look, we looked at all of the information, all of the factors. And that evidence is cited in the proposed findings. They absolutely considered all of the relevant factors. And just to pick up on the chief judge's point, he asked my friend, what was the breakdown in the process? And my friend said, they didn't consider the growth of the assets. The board absolutely had the asset levels every year. He said they didn't consider the growth and profitability. They were given the profit margins every year and over time, as I said, showing five-year snapshots of how they've changed. And they didn't get fee comparisons, which they absolutely got. So the breakdown in the process is plaintiffs arguing they want this court and ask Judge Arguello to take the same exact information that the board was given and come to a different conclusion. The Supreme Court in Jones says 36B does not authorize a court to second guess a fully informed board. Their arguments on the board are asking you to do just that. And it's not proper under Jones. But plaintiffs face a number of other hurdles on this appeal. And that is that there are six factors. I certainly place great emphasis on the board, but whether you're talking about profitability or economies of scale, those are factual findings that are well-supported in the record. You'd have to find clear error on a number of them and turn the dial on a number of factors, many of them, I would say, if you don't change your mind on the board. And that's a real problem for them, even if you accept he's got some arguments on economies of scale. The other point I would make is there's not really any errors of law that are being identified here. My friend spoke about the judge's heavy reliance on competition and comparative fees. That's not a fair reading of the decision. They cited Dr. Hubbard, who cited in a footnote talking about competition in a background section, a footnote in the background section of the opinion talking about the admissibility of testimony under the Federal Rules of Evidence. That's not a heavy reliance on comparative fees or competition. She simply lists when she gets to her finding six factors, one of which is comparative fees, and there's no evidence she gave any heavy reliance or heightened reliance in any way. The other point I would make, Your Honor, in terms of the hurdles that plaintiffs face is the credibility finding with respect to their expert. Their expert was the principal advocate for their positions, including the exact same issues that they're arguing here on appeal for many of them, and the judge found that expert simply not credible. We would submit there's no basis to revisit those findings. A lot of the same points that were made by my friend in his argument talk about the increasing profitability and the economies of scale. Those were verbatim arguments that their expert made, and she found them not credible and not supported by the evidence. I mean, the judge... And that credibility finding would be under clearly erroneous standard, right? Correct. Yeah, I mean, yeah, we would submit yes, and obviously, there's a lot of case law that suggests that credibility findings in particular should be given deference on an appeals court, particularly here where we had an 11-day trial with 16 witnesses, and the judge thoughtfully and carefully considered all of the evidence. If we were to affirm with respect to the expert, is there any other evidence on damages than what he had to say? I would submit no, Your Honor. I mean, if you read the judge's opinion when she starts off damages, she says, and it's almost an exact quote, but plaintiff's only evidence on damages was their expert, Chris Meyer. I agree with that. Their damages was put in through their expert, and he was found not credible. And maybe I should just turn to damages quickly. I mean, 36B, the statute required, it's an independent ground for affirmance. You could take everything else that we've been discussing about liability and take it off the table. If plaintiffs can't prove actual damages, they're going to lose, or you should affirm on that ground as well. Again, credibility, I think, would be enough. But the theory of damages is also legally flawed. Plaintiff's expert's opinion was that any portion of the fee that was above average constituted actual damages. And I would note that the average that they're using, my friend likes to say our fees are above average. There were many, many sources of data, Morningstar, Lipper, JDL, that said the fees were below average, and the judge found the above average data set that plaintiffs were using was an inapt comparison under Jones. So it's factually flawed. But legally, that can't be the standard for actual damages under the Supreme Court's decision in Jones. What is the standard, in your view, then? I mean, it's a great question. No court has ever had to decide that because no plaintiff has ever won. And I would not want to sit as a judge on a case where I had to decide where the outer bound—it's clearly, what is the outer bounds of arms-length bargaining? I think I can say that. But I think if you read Jones, what the Supreme Court's saying is judges are not well-suited to determine that. And therefore, we're going to defer to the board if they've got a lot of information, because it's hard to pick a point where it is. What I can tell you is that what plaintiffs have put forward, which is an average fee of an imperfect data set, cannot be it. As a policy matter, half of all fees would be excessive. That would be—regardless of how competitive an industry was or how low-priced an industry was, you can't just have half of it be excessive. And I would, in closing—I see I'm out of time—I would just say plaintiffs concede that their damages model is wrong in their briefs when they keep saying it's reasonable fees. They admit that their damages are on what they think is reasonable. That's the exact standard that was rejected in Jones, noting that Congress rejected it when they enacted the statute. Thank you, Your Honor. Counsel, thank you. Your time's expired. You're excused and will take the case under submission. Thank you for your participation today.